## LIBBY, McNEILL & LIBBY v. UNITED STATES.

No. 46984.

United States Court of Claims.
Decided Jan. 3, 1950.

Special Findings of Fact.

1. Plaintiff is and at all times herein material has been a corporation duly organized and existing under and by virtue of the laws of the State of Maine.

2. At all times herein material plaintiff was the true and lawful sole owner of the full powered American steam passenger vessel *David W. Branch*, recommissioned U. S. A. T. David W. Branch, and herein-

after called "the *Branch*," Official No. 214368, of 5,544 gross and 3,435 net registered tonnage and having the following registered dimensions: length, 380.6 feet; breadth, 48.7 feet; depth, 24.7 feet.

3. On September 15, 1941, plaintiff and defendant, the latter being represented by the Assistant Superintendent, Army Transport Service, who was duly authorized so to do, entered into a written charter party for the chartering of the vessel by plaintiff to defendant on a bareboat basis, a true copy of which charter party is in evidence herein as plaintiff's Exhibit No. 1 and is made a part of these findings by reference. The Army Transport Service is an element of the Quartermaster Corps of the United States Army, responsible for the operation of vessels required to supply and to transfer military and civilian personnel to and from Army posts and garrisons.

Pursuant to the charter party, the vessel was delivered by plaintiff and accepted by defendant at the port of Seattle, Washington, on September 15, 1941. Following such delivery and acceptance and continuing thereafter until the termination of the charter party, the vessel was in the possession and control of the defendant as charterer pursuant to the terms of the charter party. During that period, defendant officered, manned, victualed, operated, fueled, and supplied the vessel and paid the costs and expenses thereof, except that policies for certain marine insurance, as hereinafter stated, were secured and paid for by plaintiff.

4. The charter party reads in part:

"(13) (Insurance) (a) Owner shall at its own expense assume the usual American Time Hulls form of insurance for Owner's and Charterer's account, giving Charterer the benefit of such insurance. Owner and/or Insurer shall have no right of recovery or subrogation against Charterer on account of loss or damage covered by such insurance, nor shall Owner assert any claim against Charterer for loss of or damage to vessel in the event solely of a deficiency in the amount of such insurance.

"(b) Charterer shall assume all other risks, including war risk (whether or not there shall be a declaration of war) * * *

"* * * * * * *

"(c) It is understood by the Government that the present policies of Hull Insurance on said vessel contain trading warranties providing that the said vessel shall be operated only in the Western Hemisphere, not north of Eastport, Maine, nor south of Bahia Blanca on the Atlantic, nor north of Vancouver Island, or south of Valparaiso on the Pacific, but including the Panama Canal and the Hawaiian Islands. Should the Government operate said vessel beyond said trading limits, the Government shall notify Owner in sufficient time to enable Owner to obtain extension of said trading warranty from its Underwriters and the Government shall reimburse Owner for any additional insurance premiums incurred by Owner to obtain such extension.

"(d) In the event that any act or negligence of Charterer shall vitiate any of said insurance, or in the event loss or damage shall occur from a risk assumed by Charterer, Charterer shall pay Owner for all such loss or damage suffered by Owner and indemnify Owner against all claims and demands arising out of such loss or damage."

5. In compliance with the terms of the charter party, plaintiff at its own expense procured policies of marine insurance on the usual American Time Hulls form of insurance for "Owner's and Charterer's account" in amounts and on forms of policies approved by defendant, which policies carried riders recognizing the charter arrangements between the plaintiff and defendant and covered the interests of the defendant under the charter. All the insurance was in effect at the time of the stranding hereinafter described.

The policies for the American Time Hulls form of insurance contained the following usual F. C. & S. clause:

"Notwithstanding anything to the contrary contained in the Policy, this insurance is warranted free from any claim for loss, damage, or expense caused by or resulting from capture, seizure, arrest, restraint or detainment, or the consequences thereof or

of any attempt thereat, or any taking of the Vessel, by requisition or otherwise, whether in time of peace or war and whether lawful or otherwise; also from all consequences of hostilities or warlike operations (whether there be a declaration of war or not), piracy, civil war, revolution, rebellion or insurrection, or civil strife arising therefrom."

The written instruments by which all insurance involved in this charter was originally effected and later renewed are in evidence as plaintiff's Exhibits 34, 35, 36, 39(1), 39(2), 40(1), and 40(2), which are incorporated in these findings by reference.

In addition to the insurance secured by plaintiff, defendant assumed the expense of and secured endorsements to the policies, which endorsements extended warranted trading to include waters in the Western Hemisphere north of Vancouver Island.

6. There are and for many years have been two commonly used ship routes from Seattle, Washington, to Yakutat, Alaska, and to other Alaskan ports to the north or west thereof. They are commonly referred to as "The Inside Passage" and the "Outside Route."

7. *Inside Passage.* From Puget Sound to Cape Spencer, Alaska, almost due west of Juneau, numerous islands lie along the coast of British Columbia and southeastern Alaska. The innermost of these islands are closely grouped and lie close to the mainland. For almost the entire distance, running in channels through the islands or between the islands and the mainland, there is an inland waterway, navigable by large ships and protected from the open sea. This waterway is known as "The Inside Passage." The course of ships such as the Branch using this route from Seattle, Washington, to Yakutat, Alaska, is shown by the red course-line on plaintiff's Exhibit No. 6, in evidence herein, and made a part of these findings by reference.

The inside passage is narrow and tortuous, contains submerged rocks, reefs, and shoals, and swift, strong, and unpredictable currents. During the winter months, weather conditions are variable with the occurrence of much rain, wind, mist, fog, and snow, the climatic conditions combined with the geographical conditions constituting a substantial navigational hazard to vessels proceeding through the inside passage in January of any year.

Navigation of a ship the size of the Branch through the inside passage requires an experienced and competent pilot who is thoroughly familiar with the geographical and climatic conditions. He stands on the bridge and directs the helmsman, who, with the aid of a compass, steers the courses given to him by the pilot. A vessel such as the Branch, proceeding through and navigating the inside passage from Seattle, Washington, to Cape Spencer, is required to make frequent changes in course and to steer approximately 250 to 300 different compass courses. Some of the changes of course are gradual, while others are sharp and abrupt. When atmospheric conditions allow a clear view, the pilot directs the course from his observation of lights, landmarks, and other visual aids to navigation. During periods when fog, mist, rain, or snow obscure the visual aids to navigation, the pilot determines his courses by computing them from compass bearings, the speed of the vessel, and the time elapsed on a given course, taking into consideration the state of the tide, currents, and other factors known to him from experience, charts, and other navigational references. Because of the narrowness of the channel, the determination of courses by these means is not sufficiently certain to insure keeping the vessel within a safe channel, and, when suitable shore conditions are present, pilots commonly supplement this method by estimating the position of the ship in relation to the constricting shores by sounding the whistle and computing the distance from the elapsed time between the sounding of the whistle and the return of the echo.

The inside passage is used regularly by ships such as the Branch where the cargo or passenger service requires them to stop at ports on the inside route and for certain passenger service where scenic beauty is a primary concern, but it is navigationally dangerous, particularly in the wintertime when weather conditions interfere with the observation of landmarks, lights, and other

visual aids, and it has been the scene of numerous vessel strandings and marine casualties.

In order to minimize such hazards when navigating the inside passage, a vessel such as the Branch needs to be equipped with and have on board (1) accurate and reliable standard and steering compasses, (2) experienced officers and pilots having knowledge of local conditions and hazards, and (3) experienced and competent helmsmen.

8. *Outside Route.* The outside route, an alternate route from Seattle, Washington, to Yakutat, Alaska, and other Alaskan ports to the north or west thereof, including Seward, Dutch Harbor, and Umnak Island, is and for many years has been through the Strait of Juan de Fuca, thence directly to Yakutat on generally northwesterly courses over the open Pacific Ocean and Gulf of Alaska, keeping to the westward of Vancouver Island, Queen Charlotte Islands, Baranof Island, and other islands of southeastern Alaska and British Columbia, which route is shown by the green course-line on plaintiff's Exhibit No. 6.

A vessel navigating the outside route proceeds through open water and is subject to more severe force of wind and seas, but does not encounter the navigationally hazardous geographical conditions encountered in the inside passage. The outside route is well away from land, rocks, reefs, and shoals, and has for its navigation the unrestricted deep water of the open ocean for freedom in maneuvering. The outside route from Seattle to Yakutat and the other points mentioned is the safer route navigationally at all times of the year for a vessel of the size and type of the Branch and laden as such vessel was laden on voyage No. 3, hereinafter described. The outside route is approximately 100 miles shorter than the inside passage and was the customary, most direct, expeditious, and usual peacetime route from Seattle to Yakutat and ports in Alaska north and west thereof for vessels of the size and type of the Branch.

In safely navigating the outside route from Seattle to Yakutat, there is not as great a necessity for accurate and reliable Compasses, experienced officers and pilots having knowledge of local conditions, and competent helmsmen, as there is in navigating the inside passage.

9. Commencing as early as the summer of 1940, the responsible military officers of the United States Government believed that a military emergency in Alaskan territory was brewing and the United States began to move men and materials into western Alaska for the establishment of military defenses against a possible attack by the armed forces of the Empire of Japan. The preparations steadily increased until they reached their maximum after war actually commenced. In October 1941, the United States Navy took control of all merchant shipping out of Seattle, and neither any merchant ship nor any United States Army Transport vessel was permitted to leave that port except on instructions from the Routing Officer of the Thirteenth Naval District and Northwest Sea Frontier, United States Navy.

10. Following the acceptance of the vessel by defendant on September 15, 1941, and until long after the stranding, the vessel was not employed commercially or operated as a merchant vessel but was a United States Army transport, employed by defendant as a public vessel of the United States and operated by Army employees. When the vessel was delivered to defendant, the master and certain officers of the vessel left their employment with plaintiff and became and remained employees of defendant during the period here involved.

Following the delivery and acceptance and prior to her first voyage for the Army Transport Service, defendant altered and extended the passenger accommodations and fitted out the vessel for the transportation of troops and civilian personnel of the War Department, renamed or recommissioned the vessel for its use and service as the United States Army Transport David W. Branch, painted the United States Army Transport Service colors on her stack,

and placed the initials "U. S. A. T." on her bow over the ship's name.

11. On her voyage No. 1 as a United States Army Transport, the vessel loaded at the Army and Navy bases in Seattle and left there about September 26, 1941, carrying troops and their impedimenta, civilian employees of the War Department, ammunition, and materials for the establishment of bases for defense. The vessel first proceeded from Seattle to Dutch Harbor following the Great Circle route over the open sea from Swiftsure Bank off Cape Flattery, State of Washington, to Umnak pass. The troops, civilian employees of the War Department, and cargo were discharged at their proper destinations at Dutch Harbor and Nome and the vessel returned to Seattle by the same Great Circle route. The troops and civilian personnel were taken to the places mentioned to build and maintain military bases then under construction and the cargo was all for use in connection with such activities.

12. Between voyages Nos. 1 and 2, the vessel was repaired at Seattle and considerable alterations were made to permit the carrying of more troops. The vessel then took aboard war supplies, diesel oil, troops, and civilian employees of the War Department for transportation to the war bases at Yakutat, Seward, and Dutch Harbor. She proceeded first to Yakutat by way of the outside route, thence to Seward, and thence to Women's Bay, Kodiak Island. She left Women's Bay on the morning of December 7. On that day defendant was attacked by the military forces of the Empire of Japan and thereupon the Congress of the United States declared a state of war to exist between defendant and the Empire of Japan. Shortly thereafter a state of war was declared to exist between defendant and the German Third Reich and the Kingdom of Italy.

When approaching Dutch Harbor on December 7, the master of the Branch was notified by the U. S. S. Spica of the enemy attack on Pearl Harbor, that a state of war existed between the United States and the Empire of Japan, and that all precautions, including blacking out the vessel,

must be taken. Thereupon the vessel was immediately armed with guns taken from the cargo and the guns were manned by the troops on board. Special lookouts were maintained and the vessel was put on a war basis. She arrived at Dutch Harbor on December 9 and at Dutch Harbor she was painted with the grey war color, her ports were painted over so that no light could show through, and temporary blackout screens and doors were installed.

On December 22, under orders and directions from the United States Navy, she proceeded from Dutch Harbor in convoy, evacuating officers' wives and children and civilian employees of the War Department. Because of the danger from enemy submarines, the convoy pursued a zigzag course to Kodiak, as directed by the Navy. From Kodiak the vessel proceeded in convoy to Cape Spencer and from there it proceeded independently to Seattle by way of the inside passage, the entrances to which were guarded against submarines by naval patrols.

Immediately after the vessel's arrival in Seattle, defendant repainted her throughout with war colors and placed 50-caliber guns on her bridge, boat deck, bow, and stern, for protection in case of emergency. United States Army gun crews, to man the guns, were put aboard the vessel before sailing on voyage No. 3.

13. At all times after the Branch was chartered by defendant up to and at the time of the vessel's stranding on January 13, 1942, the port of Seattle, including the United States Army Port of Embarkation and the United States Navy Base, Pier No. 40, was a principal base of military supply and was the base of supply for defendant's military activities and operations in Alaska. During all of the period of voyage No. 3, the whole Alaska and the waters adjacent thereto were under military restriction, were a war zone, and were areas of military activities being conducted by defendant in the prosecution of the war in defense of Alaska against enemy operations. Yakutat, Seward, Dutch Harbor, Kodiak Island, Umnak Island, Chernofski, and "Westward" projects were war bases, bases

of war operations, and areas of war activities. "Westward" was a code name conferred on the establishment and operation of secret bases at Fort Glenn on Umnak Island and Fort Randall at Cold Bay, both within fighter plane striking distances of defendant's military installations at Dutch Harbor. The preparation of these bases resulted from advance information that an attack on Dutch Harbor was imminent, and the "Westward" projects were established for the purpose of protecting the Dutch Harbor military base which was the most westerly base then defended by the United States forces.

The construction at "Westward" had been planned, surveys had been made, and some troops had been stationed there for defense purposes prior to voyage No. 3, but actual construction had not yet started. At Yakutat, Seward, and Dutch Harbor actual construction had been under way for a substantial time prior to voyage No. 3. No enemy air or land activity took place in Alaska until a considerable time after the stranding of the Branch.

14. Prior to her departure on voyage No. 3, and on January 7, 1942, the vessel was moved to the Navy deperming station at Port Orchard, alongside Bremerton Navy Yard in Puget Sound. The deperming consisted of removing all compasses, clocks, chronometers, and barometers from the vessel and passing wire cables around the Branch to make a coil; then energizing the coil with electric current of a calculated force and for a calculated length of time and in the necessary direction to demagnetize the hull of the ship to within safe limits to neutralize its effect on magnetic mines. All ships sailing out of Seattle were either depermed or degaussed within a few weeks after the beginning of the war. Degaussing was another process also designed to prevent steel ships from attracting magnetic mines. The deperming process to which the vessel was subjected created an unstable and variable magnetic condition in the vessel which in turn created an unstable, variable, and unreliable condition of her magnetic compasses when reinstalled. The effect was to cause the compasses to "wander" and to be undependable for maintaining a course.

In normal circumstances a vessel such as the Branch would not put to sea with the compasses in that condition. The independent compass adjuster employed to adjust the compasses after deperming warned the master of the vessel of the probable effect of the deperming upon the magnetic compasses, but because of the urgent military necessity for the transportation of the personnel and materials on board the vessel to the war bases in Alaska, the voyage was undertaken notwithstanding the known unreliable condition of the compasses.

15. On January 11, 1942, the Branch departed on voyage No. 3 from the United States Army Port of Embarkation in the port of Seattle where she had been loaded, being engaged in the carrying of passengers and cargo under "secret" and "confidential" cargo manifest to war bases at Yakutat, Dutch Harbor, Seward, Umnak Island and "Westward." She was laden solely with defendant's military personnel, civilian employees of the War Department, officers and troops of defendant's armed forces, and defendant's military supplies and other materials and supplies for use directly or indirectly in prosecuting the war, including: ammunition and guns, troops impedimenta, army motor trucks, trailers, tractors and jeeps, explosives, K-D houses for housing of military personnel, Army Signal Corps equipment, diesel oil, military construction materials, machinery and equipment, troop clothing, food rations and supplies, all of which more fully appear from the passenger list and cargo manifest, both of which are in evidence herein as plaintiff's Exhibits Nos. 2 and 4, as amplified by defendant's Exhibits F and G, and all of which are made a part of these findings by reference. Among the cargo were clothing and miscellaneous supplies to be sold at the post exchanges at the Alaskan bases to civilians and troops engaged there.

To her first port of call she was carrying 5,246 barrels of diesel oil consigned to "United States Troops—Yakutat," a well-established actively operating military base.

872

The remainder of her cargo destined to her other ports of call was consigned to various branches of the armed forces, to wit: "U. S. Army Engineers," "Quartermaster Corps," "Resident Engineer U. S. E. O.," "Quartermaster Captain Edgar W. Wheeler," "Company 'E' and 'F' and 'H' 153rd Infantry," "U. S. Troops Westward," "Ordinance Officer Westward," "Quartermaster Westward," "Battery E 161st Field Artillery," "Quartermaster Depot Westward," "U. S. Engineers Westward."

16. The first port of call on such voyage No. 3 was Yakutat, Alaska, and the other ports of call were Seward, Dutch Harbor, Umnak Island, Chernofski, and "Westward." In the month of January 1942, prior to and during voyage No. 3 of the Branch, there was evidence of the presence of enemy submarines in the waters traversed by the outside route. Knowing that if the vessel were directed to follow and followed the outside route on her voyage No. 3 from Seattle, the vessel would have been openly exposed to hostile enemy action, and fearing the destruction or damage to the vessel, her passengers and cargo, and to avoid such consequences, defendant's Navy Routing Officer directed and ordered the vessel to proceed on voyage No. 3 by way of the inside passage, as a calculated risk, under a preconceived War Plan, the navigational risks of the inside passage being considered overbalanced by the menace of submarines on the outside. Sailing Orders, dated January 11, 1942, were issued by the Army Transport Service to the master of the Branch and provided in part:

"2. Having completed the embarkation of passengers and the loading of cargo and supplies, your cargo and supplies being properly stowed, your passengers safely aboard and, when in all respects ready for sea, you will sail for ports as directed above.

"*    *    *    *    *    *

"4. The vessel will be navigated at an economical speed, depending on the weather and the rules of safety. Special consideration will be given the safety of naviga-

tion, due to the weather conditions prevailing at this season of the year.

"*    *    *    *    *    *

"8. You are directed to comply with the following instructions received from Port Director, U. S. Navy:

"(a) In proceeding northbound to Yakutat, Seward and Chernofski, you will follow the inside passage from Georgia Strait to Icy Strait avoiding Hecate Strait if practicable. Homebound from Chernofski vessel will also proceed via inside passage. However, vessel may proceed via Hecate Strait if pilots are not familiar with inside passage or if some other urgent reason makes it necessary to use Hecate Strait.

"(b) You will comply with such additional instructions relative to the exact course you are to follow as may be given you by the Port Director, U. S. Navy, 13th Naval District."

Hecate Strait is a large body of water lying behind the Queen Charlotte Islands, which with Queen Charlotte Sounds opens onto the ocean on a large front and was a potential area of submarine attack.

The master also received instructions from the office of the Navy Routing Officer to proceed at her maximum full ahead speed, which was in excess of her normal and usual peacetime speed, and was so operating at the time of her stranding.

17. In navigating a ship such as the Branch through the inside passage under the conditions which prevailed on the night of January 13, 1942, at and near the time of the stranding, the customary, usual, and normally safe procedure briefly is as follows: The pilot stands on the bridge where he has a clear view of the beacon lights along the channel and, so far as darkness and atmospheric conditions permit, of the land. He fixes his course in relation to a light or lights ahead and gives an order to the helmsman who turns the ship to the right or to the left the proper distance to bring the ship onto the course the navigator has directed. The bridge and the pilothouse, which contains the wheel, are completely dark except for a dim light shinning on the compass. When the ship has been

set upon the course desired, the pilot asks the helmsman what the compass bearing is and directs the helmsman to hold the ship on that bearing. The pilot continues watching the beacon lights or other visual landmarks and can observe from such visual observation whether the vessel is maintaining the course as directed.

A local geographical magnetic influence or an unneutralized magnetic influence in the ship may cause the compass to deviate, and, in such a situation, if the helmsman keeps the ship upon the compass bearing, the ship will swing from the actual course intended by the pilot. Such magnetic influences are usually known and due allowance is made for them. Where the influence is not anticipated and, for that or any other reason the ship commences to swing, it becomes apparent to the pilot from the relation of the ship to the beacon lights, and he directs the helmsman to turn the wheel so as to bring the vessel back on the course intended. The helmsman watches the lighted compass continually and his eyes are not so well adjusted to the outside darkness as are the eyes of the pilot. His duty is to follow implicitly the orders of the pilot and to exercise no independent judgment in following a course except to keep the vessel on the course directed by the pilot. He does not watch the beacon lights or the landmarks for the purpose of steering the ship, but steers by the compass under directions from the pilot. This was the procedure being followed by the pilot and the helmsman on the night of January 13, 1942, prior to the stranding.

18. On January 13, 1942, about 10:38 p. m., the Branch was at approximately latitude 54°1' North, longitude 130°14' West of Greenwich, abeam Herbert Reef on its port. Herbert Reef is approximately two miles south of Hanmer Island. There had been rain and mist earlier in the day, but the weather had cleared so that Hanmer Island was visible from the vessel as were the beacon lights at Genn Island and Lawyer Island beyond Hanmer Island to the northwest. The distance from Herbert Reef to Lawyer Island is approximately seven miles. The pilot went into the chart room to check the time and the courses, leaving the master on the bridge. On passing Herbert Reef the master lined up the vessel with the Genn Island light about 4° on the starboard bow, which placed the course of the vessel approximately 350 yards, or a little better, to the west of Hanmer Island, a proper and safe course for navigating the reach from Herbert Reef past Hanmer Island. The pilot returned to the bridge about 10:42. After the pilot's eyes became adjusted to the dark, the master, having made sure that the pilot had seen the beacon lights and Hanmer Island and having seen that the vessel was on a safe track, went into the chartroom.

Because of manpower shortage due to the war it was difficult to procure experienced and competent helmsmen, and for that reason the helmsmen on board were incompetent and inexperienced and there was a standing order for the mate on watch to stand alongside the helmsman to watch his steering. When the master got into the chartroom he found there the second mate who should have been watching the helmsman. He sent the second mate back to the pilothouse immediately. Shortly thereafter the pilot noticed the Genn Island light blocking out, which showed that the vessel had diverged from its course far enough that Hanmer Island was coming between the ship and the Genn Island light. The pilot called, "Left", to the helmsman, but the helmsman swung to the right and the vessel continued to diverge from the directed course. The pilot then shouted, "Hard left", but the helmsman swung hard right. This pulled the vessel away from the safe channel and toward Hanmer Island.

On hearing these commands, the master knew that something unusual was occurring and immediately returned to the bridge, but his eyes had adjusted themselves to the lights of the chartroom, and when he came out on the bridge he could not see in the darkness sufficiently well to observe the situation and to give an immediate order. The second mate jumped to the wheel and put it hard left. In about

a minute the master could see the island near at hand and ordered the vessel full astern. Almost immediately after that the vessel hit the partially submerged reef which is a part of the island. This occurred at 10:46 p. m.

The instability of the steering compass as a result of the deperming operation may have been a contributing factor to the ship's deviation from her course. The stranding would not have occurred, however, if the helmsman had been competent and had obeyed the directions of the pilot.

The officers of the vessel in charge of navigation and the pilot on voyage No. 3 were experienced and capable in the navigation of the outside route, but were inexperienced and without adequate local knowledge of the conditions and hazards to be encountered in the waters of the inside passage.

19. As a direct consequence of the stranding, the vessel suffered severe damage to her hull, machinery, and appurtenances, and in order to release the vessel from her strand it become necessary to jettison a portion of her cargo and to transfer the remainder thereof to other vessels for immediate carriage to destination, and to otherwise undertake and carry out extensive salvage operations. After being released from her strand the vessel was returned to the port of Seattle, where repairs to her hull, machinery, and appurtenances were promptly carried out and satisfactorily completed at 12:00 noon April 13, 1942, through the joint and combined efforts of plaintiff and defendant.

Plaintiff, as owner of the vessel, without prejudice to the question of ultimate liability therefor under the charter party, was requested to and did incur and expend, in connection with the repairs to said vessel and said salvage operations, including general average, the reasonable sum of $372,470.07. Defendant has paid plaintiff on account of general average the sum of $26,954.49, reducing plaintiff's net expenditure to $345,515.58.

The charter party provides in part: "(6) (Hire) (a) The Government shall pay to the Owner the sum of $3.50 per deadweight ton for the use of the vessel, payments to be made monthly as earned, commencing on and from the day and hour of delivery, * * * hire to continue until the day and hour when the vessel is redelivered to the Owner except: * * * (3) if the vessel is damaged or injured under any of the risks herein assumed by the Government, to the extent that she is no longer fit for the Government service, the Government may, for the purpose of computing hire, but for no other purpose declare the vessel constructively lost by giving written notice to the Owner or its representative, in which event hire shall cease and this Charter Party shall terminate; * * *"

The vessel was not damaged to the extent that she was no longer fit for defendant's service. The defendant did not for the purpose of computing hire or otherwise, declare said vessel constructively lost, by giving written notice to plaintiff or its representative, or otherwise. Plaintiff has demanded payment and defendant has failed and refused to pay plaintiff charter hire for the period beginning at 10:46 p. m. January 13, 1942, the time of the stranding, and continuing to 12:00 noon April 13, 1942, when the repairs were satisfactorily completed. At the rate specified above, charter hire for such period would be the sum of $60,085.57.

Plaintiff has performed and carried out all obligations, matters and things required by or provided in said charter party to be performed and carried out by plaintiff as the owner of the vessel.

20. Following the stranding and prior to the institution of this action plaintiff received from London Marine Underwriters the total sum of $342,170.48. That sum was received pursuant to and under the conditions of the following loan agreement stated in the following telegram:

"428 Branch Have Now Obtained Agreement Underwriters Settle As Loan Without Interest And Repayable Only To Extent Any Recovery Obtained From Government It Being Condition Of Loan That Owners Make Application For Such Recovery And Lend Use Their Name And Give Assistance Obtain Any Recovery Stop

Please Cable Acceptance Enable Us Proceed Collection"

The sum received from the Fireman's Fund Insurance Company was received pursuant to and under the conditions of the following loan agreement:

"(Loan Receipt)

"Received from Fireman's Fund I·surance Company the sum of One Thousand Five Hundred Seventy and 27/100 Dollars ($1,570.27) as a loan and not as payment of any claim, repayable only out of any net recovery the undersigned may make from any vessel, carrier, bailee, or others upon or by reason of any claim for the loss of or damage to the property described below, or from any insurance effected by the undersigned or by any carrier, bailee or others on said property, and as security for such payment we thereby pledge to the said Insurance Company all such claims and any recovery thereon.

"In further consideration of the said advance, we hereby guarantee that we are the persons entitled to enforce the terms of the contracts of transportation set forth in the bills of lading covering the said property; and we hereby appoint the agents and officers of the said Insurance Company and their successors severally, our agents and attorneys in fact, with irrevocable power to collect any such claim and to begin, prosecute, compromise or withdraw, in our name, but at the expense of the said Insurance Company, any and all legal proceedings which they may deem necessary to enforce such claim or claims, and to execute in our name any documents which may be necessary to carry into effect the purposes of this agreement.

"Executed in duplicate at Chicago, Ill., this 16th day of August 1943.

"Libby, McNeill & Libby,
"By A. M. Jasper
"*Treasurer.*"

\*   \*   \*   \*   \*   \*

Without Prejudice As To Whether War
Or Marine Risk

No agreements or understandings existed between plaintiff and said underwriters other than as set forth in and evidenced by the foregoing loan agreements.

Stanley B. Long, Seattle, Wash., for plaintiff. Thomas L. Morrow and Bogle, Bogle & Gates, Seattle, Wash., were on the briefs.

J. Frank Staley, Washington, D. C., with whom was Assistant Attorney General H. G. Morison, for defendant.

Before JONES, Chief Judge, and MADDEN, LITTLETON, WHITAKER and HOWELL, Judges.

MADDEN, Judge.

The plaintiff on September 15, 1941, bareboat chartered its vessel, the David W. Branch, to the Government. The vessel was a combination passenger and cargo vessel of a gross tonnage of 5,544 tons. Under the charter the Government was to man and supply the vessel, pay the costs and expenses of its operation, and pay a stated hire for the use of the vessel, with a suspension of hire for any "loss of time caused by damage to or by the said vessel under any of the risks herein assumed by the owner or in making any repairs or replacements for which owner is liable." The charter contained the following provisions, here pertinent, relating to insurance:

"Owner shall at its own expense assume the usual American Time Hulls form of insurance for owner's and charterer's account, giving the charterer the benefit of such insurance. Owner or insurer shall have no right of recovery or subrogation against the charterer (Government) on account of loss or damage covered by such insurance.

"(b) Charterer shall assume all other risks, including war risk (whether or not there shall be a declaration of war.) \*   \*   \*"

A new insurance policy, taken out by the plaintiff on December 31, 1941, upon the expiration of the policy in force at the time of the charter, contained an endorsement by the insurance company saying: "It is agreed for the period of the charter of the above-named vessel to the United

States Government * * * this insurance is extended also to cover the interest of the United States Government."

The policy was the usual American Time Hulls form of policy and contained the usual F. C. and S. (Free from Capture and Seizure) clause, reading as follows: "Notwithstanding anything to the contrary contained in the Policy, this insurance is warranted free from any claim for loss, damage, or expense caused by or resulting from capture, seizure, arrest, restraint or detainment, or the consequences thereof or of any attempt thereat, or any taking of the Vessel, by requisition or otherwise, whether in time of peace or war and whether lawful or otherwise; also from all consequences of hostilities or warlike operations (whether there be a declaration of war or not), piracy, civil war, revolution, rebellion or insurrection, or civil strife arising therefrom."

The present litigation concerns and depends upon the interpretation and application of these insurance provisions to the facts hereinafter stated. For the present, we state merely that the vessel was, during its operation by the Government under the charter, stranded and severely damaged. The question is, was the damage a consequence of a warlike operation, and therefore not covered by the plaintiff's policy. If it was not, the Government must pay for the damage, since, as we have seen, it assumed "all other risks, including war risk * * *."

The chartered vessel, the Branch, was in the possession of the Quartermaster Corps, which then operated the Transport Service of the War Department. The vessel was used to transport supplies and personnel between Seattle, Washington, and Alaskan ports, for the War Department. It was manned with civilian officers, some of whom, including the master and the pilot on watch at the time of the stranding, had been previously employed by the plaintiff, and with a civilian crew. The vessel was designated as an Army Transport, was painted gray, and was equipped with guns manned by an armed guard.

In January 1942 the Branch was loaded at the port of Seattle with materials for the construction of air bases in Alaska, food, kitchen supplies and diesel oil, and "troop cargo." The passenger list contained 133 civilians for employment in the construction of the air bases, and some 160 officers and enlisted men of the Army and Navy. Before sailing, the Branch was "depermed." This process is described in Finding 14. It was for the purpose of eliminating the attraction which a steel vessel would otherwise have for magnetic mines. During the deperming the compass and other navigational instruments were removed. After deperming they were replaced, but the accuracy of such instruments may be and on the Branch was affected for some time by the unstable and variable magnetic condition produced in the vessel by deperming. The Branch was directed to sail by the "Inside Passage" which is described in Finding 7, rather than by the open ocean outside the coastal islands. See Finding 8. The outside route is shorter and is the route normally followed in peacetime. But ships whose passenger or cargo service require them to stop at ports on the inside route, and ships which exploit the scenic beauty of the islands and mainland, use that route regularly in peacetime. It is, however, narrow and tortuous, contains submerged rocks, reefs and shoals and swift, strong, and unpredictable currents. In winter there is frequently rain, wind, mist, fog, and snow which, when it occurs, adds to the hazards of navigating that passage. However, the apprehended peril from Japanese submarines caused the Government to choose to use the inside passage for its own ships unless they could be heavily convoyed, and to require ships operated by private owners to use it. The Branch was, therefore, under orders to use the inside passage here involved.

The Branch left Seattle on January 11, 1942. She proceeded without incident until, at 10:38 p. m. on January 13, she was at latitude 54° 1' North abeam Herbert Reef on her port. Herbert Reef is some two miles south of Hanmer Island. The night

was clear and the beacon lights at Genn Island and Lawyer Island, seven miles north, were visible. The pilot, who stands on the bridge to watch the beacon lights and give orders to the helmsman, went to the Chart Room to chart the time and courses leaving the master on the bridge. On passing Herbert Reef the master lined up the vessel with the Genn Island light about 4° on the starboard bow which placed the course of the vessel approximately 350 yards to the west of Hanmer Island, a proper and safe course for navigating past that island. The pilot returned to the bridge at about 10:42. After the pilot's eyes had become adjusted to the dark, the master, having made sure that the pilot had seen the beacon lights and Hanmer Island, and that the vessel was on a safe course, went to the Chart Room. Because of manpower shortage due to the war it was difficult to procure competent and experienced helmsmen and there was a standing order that the mate on watch stay with the helmsman to watch his steering. However, when the master got to the Chart Room he found the mate there. He sent him immediately to watch the helmsman. The pilot noticed that the Genn Island light was blacking out which showed that the ship was veering toward Hanmer Island. He called "left" to the helmsman, but the helmsman steered right. He shouted "Hard left" but the helmsman swung hard right. The second mate jumped to the wheel and put it hard left. The master, who had heard the excited commands and had returned to the bridge, saw Hanmer Island nearby and ordered full astern. But the vessel hit a submerged reef which is a part of Hanmer Island, and stranded. This was at 10:46 p. m.

The stranding of the Branch caused severe damage to her hull, machinery and appurtenances, and in order to release the vessel it became necessary to jettison a part of her cargo and transfer the rest to other vessels for carriage to destination, and to otherwise carry out extensive salvage operations. After her release she was returned to Seattle and repaired, and was again ready to sail on April 13, 1942. The plaintiff spent, in connection with the repairs and salvage operations, including general average, the reasonable sum of $372,470.07. The Government has paid the plaintiff on account of general average $26,954,29 leaving the plaintiff out of pocket $345,515.58. The plaintiff has received from the insurance company which issued the American Time Hulls policy $342,170.48 as a loan without interest and repayable only to the extent that the plaintiff may obtain recovery from the Government.

The question is, of course, whether the risk of the loss which occurred here was carried by the insurance company which issued the American Time Hulls policy, or by the Government. The answer depends, as we have said, upon the interpretation and application of the insurance provisions of the charter agreement, which we have quoted above. The policy expressly excepted from coverage those losses which were "consequences of hostilities or warlike operations."

The Government contends that the Branch was not at the time of her stranding engaged in a warlike operation. We think she was. She was in possession of and being operated by the Army and was loaded with materials and persons being transported for the Army's war purposes.

We thus reach the question whether the loss here sued for was a "consequence of a warlike operation." To be a consequence is, we suppose, to be the result of a cause. Since the parties to these agreements were creating important legal relations, which might find their enforcement in litigation, we may assume that they were writing of legal consequences resulting from legal causes. We look therefore to the legal doctrines which have developed around the much litigated problem of causation. Was the fact that the Branch was engaged, as we have concluded that she was, in a warlike operation, the legal cause of her stranding? Since most of the litigation in which the question of causation has been considered has been litigation concerning negligence, we look to such liti-

gation for our principles. We recognize that the problems of causation are not quite the same in negligence litigation and in the instant case. Before the question can arise in a suit based upon negligence it must be found that the defendant was negligent. Then comes the question whether his already proved negligence was the legal cause of the injury, that is, whether he must pay for the harm which occurred. But having already concluded that the defendant is guilty of negligence, there is, of course, a considerable human urge, even in the judicial mind, to find a responsible connection between the negligence and the damage. In the instant case there can be, of course, no such urge. It was not negligent, or otherwise wrongful, to engage in warlike operations when the country was at war. The Government, so engaging, should be liable for the risks which it by its contract agreed to carry, but only for those risks.

In the law of torts it is elementary that the mere fact that event B would not have happened "but for" the happening of event A does not make A the legal cause of B nor B the legal consequence of A. The fact, therefore, that the ship would not have been where she was, and hence would not have been stranded "but for" the fact that she was engaged in the warlike operation, does not help to answer our question.

The fact that the ship was on the inside passage rather than in the open ocean was not a consequence of her warlike operation. If she had never been chartered to the Government but had been retained and operated by the plaintiff carrying civilian passengers and merchandise, she would have navigated the inside passage if she had navigated in that direction at all. The incompetence of her helmsman, because of a shortage of competent helmsmen would have been just as likely to occur under civilian operation, since the helmsman would have been obtained from the same labor market. Private ships were "depermed" to protect them from magnetic mines in the same way that the plaintiff's ship was depermed, and if the ship had remained in the plaintiff's possession it would have been depermed as soon as there was opportunity. The fact then that her compass was made inaccurate by the deperming was not a consequence of her warlike operation. These facts, sailing the inside passage, the incompetent helmsman, and the wandering compass, were the consequences of the war, but were not the consequences of the warlike operation of the plaintiff's ship. They could just as readily have happened to any ship operating in wartime, but without any connection with the war.

We now consider the decisions in which the very language involved in the insurance arrangements here in question has been interpreted and applied to various fact situations.

In Queen Ins. Co. of America v. Globe & Rutgers Fire Ins. Co., 263 U.S. 487, 44 S.Ct. 175, 68 L.Ed. 402, the ship Napoli in the summer of 1918 sailed from New York for Genoa with a cargo, a part of which was intended for the Italian Government, and a small part of which was munitions of war. All of the cargo was contraband. At Gibraltar the ship joined a convoy, as it was practically necessary to do, though not ordered by the military powers. The convoy sailed with screened lights, protected by British, Italian, and American war vessels, and navigated by an Italian commander on the Napoli, subject to the command of a British captain as the senior naval officer present. The Napoli's convoy met another convoy head-on, there was confusion, and a British steamship in the other convoy struck and sank the Napoli. The court, in its opinion written by Justice Holmes, held that the loss of the Napoli was not a "consequence of a warlike operation" within the meaning of the insurance policy language. It said that the common understanding in construing these policies is that the courts are not to take "broad views" but generally are to stop their inquiries with the cause nearest to the loss. The thought apparently expressed was that, the loss having been occasioned by the collision of two merchant ships, the more remote facts that they were sailing

in convoy and with screened lights because of the war were not legal causes of the collision and loss. The court relied upon the decision of the House of Lords in the cases of the Petersham and of the Matiana, heard and decided together, British Steamship Co. v. The King, [1921] 1 A.C. 99. In the case of the Petersham, it was a vessel chartered to the crown, sailing without lights because of Admiralty regulation and it collided with a Spanish vessel also sailing without lights. It was found that, because of the absence of lights, the collision could not have been avoided by reasonable care. It was held that the loss was a result of a "peril of the sea", i.e. a collision, and not a "consequence of a warlike · operation." In the case of the Matiana a vessel sailing in convoy struck a reef without negligence on the part of the master, or of the naval officer in charge of the convoy. Again it was held that the loss was not a consequence of a warlike operation.

In the Queen Ins. Co. case, supra, the court said, "There are special reasons for keeping in harmony with the marine insurance laws of England, the great field of this business * * *." [263 U.S. 487, 44 S.Ct. 176] This statement is heavily relied upon by the plaintiff, for reasons that will become apparent.

In the case of General Insurance of America v. Link, et al., 173 F.2d 955, 956, the United States Court of Appeals for the Ninth Circuit held that a loss caused by a collision of a small armed navy oil tanker with a privately owned merchant ship, due to the fault of both ships, was a consequence of a warlike operation. The court points out that the Queen Insurance Co. case, supra, did not involve "the wrongful commands of naval officers directing the navigation of an armed naval vessel in a war service." Although we have found that the Branch was engaged in a "warlike operation," that operation did not answer the description just quoted and relied upon to distinguish the General Insurance Co. case from the Queen Insurance Co. case. The Court of Appeals for the Ninth Circuit relied upon the House of Lords decision in Board of Trade v. Hain S. S. Co. Ltd. [1929] A. C. 534, where a British steamship, under requisition to the Government, collided with a ship operated by the United States as a mine planter, officered and manned by Navy officers and crew. Both vessels were negligent. It was held that the loss was the consequence of a warlike operation, that of the American mine planter. In the case of Attorney General v. Adelaide Steamship Co. (The Warilda) [1923] A.C. 292, the House of Lords held that where the steamship Warilda, requisitioned by the Admiralty and used as an ambulance transport, was proceeding from Harve to Southampton with 603 wounded men and a staff of doctors and nurses aboard, and, in accordance with Admiralty instructions was steaming at top speed and without lights, and struck a merchant vessel proceeding at top speed with dimmed side lights, the damage to both ships was a consequence of a warlike operation, that of the Warilda. It was held that the negligence of the master of the Warilda should not affect the decision.

We come now to the case upon which the plaintiff relies most strongly, the recent decision of the House of Lords in the case of the Coxwold, the full title of which is Yorkshire Dale Steamship Co. Ltd. v. Minister of War Transport, [1942] A. C. 691, 58 The Times L. R. 263. In that case the use of the vessel had been requisitioned by the British Government, and the vessel, while carrying a military cargo in convoy, altered her course under orders of the Naval Commodore in charge of the convoy, to avoid what was thought to be an enemy submarine, and ran aground.

The House of Lords decided that the loss was a consequence of a military operation. Some of the learned lords, including Viscount Simon, the Lord Chancellor, p. 700 of the A. C. report, and Lord MacMillan, id. p. 702, seem to have rested their conclusions on the fact that the arbitrator, who had first decided the case, had concluded that the stranding was a consequence of military operations, and that the courts had "no right to reverse this conclusion, unless the facts found by him cannot support it." On this basis, the decision would not be of great importance, as it would leave to the first trier of the facts a good deal of leeway, just as a jury in a negligence case has

leeway to find that the negligence was or was not the cause of the loss. But others of the lords used language much more inclusive. Lord Wright said: "The warlike operation is (as it were) an *umbrella* which covers every active step taken to carry it out, including the navigation, the course or helm action intended to bring the vessel to the position required by the warlike operation, and that none the less because accident, mischance, or negligence lead to stranding or collision."

Lord Porter said: "The logical conclusion of these observations would seem to be that, in a case where the warlike operation consists in passing from one war base to another, any accident due to proceeding between the starting and finishing point is caused by the warlike operation."

Lord Atkin said: " * * * if in the course of a warlike operation the direction of the ship's course against another ship is a consequence of a warlike operation, Attorney-General v. Ard Coasters (37 The Times L.R. 692; (1921) 2 A.C. 141), it is surely impossible to distinguish the case where the course of the ship is directed against a rock, and this whether negligently or without negligence, and whether the ship is deflected by tide, or current or wind. * * * ."

We think, then, that the present English interpretation of the insurance clause in question is that when a casualty occurs to a ship which is engaged in a warlike operation, as a result of any activity of the ship, the loss is a consequence of the warlike operation. The development of the English law toward this conclusion is traced by Lord Wright in his opinion in the case of the Coxwold, supra. The end result seems to us to make the expression about a loss which occurs as a "consequence of a warlike operation" mean a loss which occurs "while the ship is engaged in a warlike operation." We do not think that these expressions are identical in mean-

ing. They are not treated so in the law generally. In the Restatement of Torts, Vol. 2, Negligence, Section 281, the following illustration is given: "2. A gives a loaded revolver to B, a boy of eleven, to carry to C. In handing the revolver to C, the boy drops it, crushing the bare foot of D, a comrade. The fall discharges the revolver, wounding C. A is liable to C but not to D."

We think that there must be some causal relation between the warlike operation in which such a ship as the Branch is engaged, and the casualty in question, before the casualty can be regarded as a consequence of the warlike operation. In addition to being urged to that conclusion by general legal principles, we think that this must have been the intention of the parties in making their contracts. The Branch was chartered to the United States in September 1941, the charter being negotiated by the Assistant Superintendent, Army Transport Service. The plaintiff thus knew what the ship was going to be used for. The charter, as we have said, required the plaintiff to carry ordinary marine insurance. The current policy expired on December 31, 1941. In the new policy, issued as of that date, the insurance company attached an indorsement recognizing the charter arrangement, and extending the policy to cover the interest of the United States. We were, of course, then at war. If the broad expressions of the Coxwold decision, supra, are to be followed, all of these careful arrangements were substantially meaningless, because the policy did not protect any one against any loss of a kind which, in fact, was likely to happen.[1] The plaintiff was, in effect, wasting its money in buying the insurance, and the insurance company was getting its premium for carrying substantially no risk.

We think that the parties must have intended that the marine insurance should cover the risks which the ship would have

---

1. See the statement of Lord Porter in the Coxwold case, supra, that "almost any casualty befalling a vessel as a result of her own action in proceeding on a voyage, in a case where proceeding on that voyage was a warlike operation, was caused by a warlike operation * * * ."

And see the statement in the plaintiff's brief at page 164 that "Almost every casualty to a vessel occurring during a warlike operation is caused by and is a consequence of the warlike operation."

been subject to if she had been operated by her owner for the owner's commercial purposes. The ship would have been just as likely to have run aground if so operated, as it was when operated by the army. It would have had the perils of the inside passage, the unreliability of the compass resulting from deperming, and the dangers of having an incompetent helmsman, due to the shortage of experienced labor. The only change in actual navigating conditions resulting from the ship's military errand was the slightly increased speed, and that had nothing to do with the ship's stranding.

We conclude, therefore, that the casualty which befell the Branch was not a consequence of a warlike operation, and that the Government is under no contractual liability to compensate the plaintiff for the loss. The plaintiff's petition will be dismissed.[2]

It is so ordered.

JONES, Chief Judge, and LITTLETON, Judge, concur.

WHITAKER, Judge (concurring).

I agree that plaintiff's petition in this case should be dismissed, but I come to this conclusion for a somewhat different reason from that stated by the majority.

The exception in the insurance policy taken out by the charterer read in part: "also from all consequences of hostilities or warlike operations * * *." It seems to me that the opinion of the majority overlooks the word "hostilities." I think it is clear that the Branch was in the Inland Passage in consequence of hostilities, and I think it is clear that it was "depermed" in consequence of hostilities.

However, the Inland Passage could be safely navigated with due care by a vessel that had been depermed and whose compass in consequence was out of order. It could have been safely navigated even though the

helmsman was inexperienced, provided the mate had done what he had been told to do, that is, if he had stayed with the helmsman. I think if he had obeyed orders and been beside the helmsman when the order was given to turn left, he could have stopped the helmsman from turning to the right. This, it seems to me, was the cause of the loss and I do not think it can be said that the loss came about in consequence of hostilities or warlike operations.

If it had been extremely hazardous to sail a depermed vessel in this Inland Passage, my opinion would probably be different, but the proof shows that vessels can be safely operated in this passage if due care is exercised. I do not think due care was exercised in this case and that this was the cause of the loss.

HOWELL, Judge, concurs in the foregoing opinion.

---

2. The conclusion which we have reached is in accord with the decision of the United States Court of Appeals for the Second Circuit, in the case of United States v. Standard Oil Company of New Jersey, 178 F.2d 488.

Judge Clark's excellent opinion in that case has come to our attention too late to be discussed in this opinion.