# LIBBY, McNEILL & LIBBY *v.* UNITED STATES.

No. 37.   Argued October 13, 1950.—Decided November 27, 1950.

*Stanley B. Long* argued the cause for petitioner.   With him on the brief was *Edward G. Dobrin.*

*Samuel D. Slade* argued the cause for the United States. With him on the brief were *Solicitor General Perlman* and *Assistant Attorney General Morison.*

MR. JUSTICE BLACK delivered the opinion of the Court.

This is a companion case to *Standard Oil Company of New Jersey* v. *United States,* 340 U. S. 54, decided this day.   Here, as there, the Government insured petitioner's ship against war risks including "all consequences of hostilities or warlike operations."   The ordinary marine risks were covered by a Lloyd's policy.   The vessel, United States Army Transport *David W. Branch,* stranded on January 13, 1942, when an inexperienced helmsman made a mistake in steering.   The Government admits that the

*Branch* was engaged in the warlike operation of transporting military supplies and personnel between war bases, but denies that the warlike phases of the operation caused the stranding. The Court of Claims found as a fact that there was no causal connection between the "warlike operation" and the stranding, and accordingly gave judgment for the United States. 115 Ct. Cl. 290, 87 F. Supp. 866. Petitioner's contentions for reversal here are substantially the same as those advanced in *Standard Oil Company of New Jersey* v. *United States, supra.* The reasons given for our holding there require affirmance in this case.

*Affirmed.*

MR. JUSTICE DOUGLAS dissents for the reasons set forth in his dissent in *Standard Oil Company of New Jersey* v. *United States,* 340 U. S. 54, 70, decided this day.

MR. JUSTICE FRANKFURTER, joined by MR. JUSTICE JACKSON, dissenting.

This is another marine insurance case raising the same legal issue as *Standard Oil Co.* v. *United States, ante,* p. 54, and is to be decided in light of it. The facts of the case must be considered, for the question whether the loss was a "consequence" of hostilities and warlike activities cannot be answered in the abstract.

The *Branch,* a combination passenger and cargo vessel having a gross tonnage of 5,544 tons, was chartered to the United States by her owners on September 15, 1941. The owners insured against marine risks, and the Government insured against "all consequences of hostilities or warlike operations." On January 11, 1942, the *Branch* departed from Seattle for certain Alaskan ports. She was operated by the Army and was loaded with materials and personnel destined for war bases in Alaska. The

sailing orders issued by the Army Transport Service directed the *Branch* to follow the inside passage to Alaska because there was danger of submarine attack if the outside route across open seas were followed. On the night of January 13, the *Branch,* running on a course 350 yards off Hanmer Island, diverged from the course and headed toward the island. The helmsman, who was found to be incompetent, turned in an opposite direction from that ordered by the pilot when the divergence was noticed, and the vessel ran aground on a partially submerged reef.

Here, as in the *Standard Oil* case, it is clear that the vessel was engaged in a warlike operation, and the Court of Claims so concluded. The only question is whether in the circumstances the running aground is fairly to be considered a "consequence" of the warlike activity. The court below concluded that it could not look beyond the fault of the helmsman although it found specially a number of facts indicating that the collision grew out of the warlike activity of the vessel.

(1) The court found that the "deperming process to which the vessel was subjected created an unstable and variable magnetic condition in the vessel which in turn created an unstable, variable, and unreliable condition of her magnetic compasses when reinstalled. . . . In normal circumstances a vessel such as the Branch would not put to sea with the compasses in that condition. . . . [B]ut because of the urgent military necessity for the transportation of the personnel and materials on board the vessel to the war bases in Alaska, the voyage was undertaken notwithstanding the known unreliable condition of the compasses." 115 Ct. Cl. 290, 301, 87 F. Supp. 866, 871. The court further found that the helmsman was steering "by the compass under directions from the pilot" prior to the stranding, and that the "instability of the steering compass as a result of the deperming operation may have been a contributing factor to the ship's

deviation from her course." 115 Ct. Cl. at 304, 305, 87 F. Supp. at 873, 874.

(2) The court found that the master "received instructions from the office of the Navy Routing Officer to proceed at her maximum full ahead speed, which was in excess of her normal and usual peacetime speed, and was so operating at the time of her stranding." 115 Ct. Cl. at 303, 87 F. Supp. at 872.

(3) The court found that the inside passage through which the *Branch* was ordered to proceed in order to avoid submarines, "is narrow and tortuous, contains submerged rocks, reefs, and shoals, and swift, strong, and unpredictable currents." 115 Ct. Cl. at 295, 87 F. Supp. at 868. It found that the inside passage "is navigationally dangerous, particularly in the wintertime when weather conditions interfere with the observation of landmarks, lights, and other visual aids, and it has been the scene of numerous vessel strandings and marine casualties." 115 Ct. Cl. at 296, 87 F. Supp. at 868.

(4) The court found: "Because of manpower shortage due to the war it was difficult to procure experienced and competent helmsmen, and for that reason the helmsmen on board were incompetent and inexperienced and there was a standing order for the mate on watch to stand alongside the helmsman to watch his steering." 115 Ct. Cl. at 305, 87 F. Supp. at 873.

In its opinion the court below concluded that the speed of the ship had nothing to do with the stranding. It also considered that sailing the inside passage, the incompetent helmsman, and the wandering compass were consequences of war, rather than the warlike operation of the ship, since civilian vessels would have been subject to the same conditions. But this misses the point, for the court itself found that the vessel put to sea with unreliable compasses only "because of the urgent military necessity for the transportation of the personnel and materials on

board the vessel to the war bases in Alaska." 115 Ct. Cl. at 301, 87 F. Supp. at 871. There is nothing to suggest that any civilian vessel would voluntarily embark on such a voyage through a tortuous passage, at high speed, with unreliable compasses and incompetent personnel. Where the contributing forces of an occurrence are in such large part patently referable to the warlike operation of the vessel, the insurer against all consequences of hostilities and warlike operations should not be relieved of liability because, under such circumstances, the helmsman was incompetent and failed to follow the orders of the pilot.