MESECK TOWING LINES, Inc., et al. v. EXCESS INS. CO., LIMITED, et al.

No. 17831.

District Court, E. D. New York.

May 14, 1948.

Kirlin, Campbell, Hickox & Keating, of New York City (Robert S. Erskine and John H. Hanrahan, Jr., both of New York City, of counsel), for libelants.

Mendes & Mount, of New York City (Russell T. Mount and Wilbur H. Hecht, both of New York City, of counsel), for respondents.

J. Vincent Keogh, U. S. Atty., of Brooklyn, N. Y., and Edward L. Smith, Sp. Asst. to Atty. Gen., amici curiae.

GALSTON, District Judge.

The question to be determined in this case is the interpretation to be given to a policy of insurance issued by the respondents covering the Frederick E. Meseck, a tug owned by the Meseck Towing & Transportation Co., Inc., in respect to all loss and damage sustained by the tug through any and all risks, perils or dangers of the seas, bays, harbors, rivers, etc., and also to such liability as the assured would incur by reason of damages caused by the tug to any other vessel in collision.

There is no dispute about the facts. On March 19, 1944, at about 8 A.M., the tug Frederick E. Meseck was proceeding from a Staten Island dock to the Lower Bay in New York harbor. When about off Pier 13, Staten Island, her navigator sighted the United States Naval Vessel SC 1294, which was then about off Pier 5, Staten Island, and was approaching the tug "end-on, or nearly so". It is alleged and not denied that the navigator in charge of each vessel sighted the other vessel in ample time and with ample room in which to navigate properly in compliance with the rules of the road; but the navigators negligently failed to reach a passing agreement, exchanged cross signals and kept on, the SC 1294 altering her course to her port, and the Frederick E. Meseck altering her course to her starboard, with the result that the vessels collided and each sustained damage.

Negotiations thereafter were entered into between counsel for the libellants and the United States of America, as owner of the SC 1294, and an agreement was entered into, approved by the respondents herein insofar as they were concerned, that the collision was due to the negligent navigation of both the tug and the government vessel for failure to comply with the Inland Rules of Navigation. The terms of settlement were completed and the libellants received from the United States a net payment of $7,132.38.

The libel alleges that the SC 1294 intended to enter upon patrol duties off Ambrose Channel. In a letter dated January 30, 1946, written by Robert H. Alcorn, Captain, U. S. N. R. District Legal Officer, to the proctors for the libellants, it appears that the war vessel at the time of the collision had not entered upon the patrol duties which were to be performed off Ambrose Channel, and indeed had not reported to anyone in command of the area off Ambrose Channel.

From the same source it appears that the general nature of the patrol duty which the SC 1294 was to perform off Ambrose Channel was primarily that of scouting, employing visual radar and sonar searching methods. The directing of traffic in Ambrose Channel and the Swept Channel was an important but secondary duty. The vessel had been at the naval pier at Tompkinsville immediately prior to the collision for routine fueling, provisioning, repair and maintenance purposes. Normally the vessel was berthed there two or three days in every week or eight days. She carried at the time of the collision three officers and between twenty-one and twenty-four men, and was equipped with one 40 MM gun, three 20 MM machine guns, twelve (estimated) 300 lb. depth charges, and one set of "Mouse-Trap" forward throwers. See also the deposition of Lieutenant Elabernd to the same effect.

The libel alleges that the respondents are indebted to the libellants in the sum of upwards of $4,500 on account of that portion of damages to the tug which resulted from the collision, and which was not recovered from the United States of America in the settlement, and fifty per cent of the damages of the SC 1294 paid by the libellants, together with the fees and expenses of litigation, less certain credits.

The respondents in their answer insist that at the time of the collision the SC 1294 was engaged in a warlike operation in that it was proceeding to its patrol station for the purpose of maintaining an anti-submarine screen off the Harbor of New York in time of actual war; that the policy of insurance sued on is warranted free from all consequences of hostilities or warlike operations, and that the collision was a consequence of warlike operations.

So recourse must be had to the language of the policy which expresses the following exception:

"Notwithstanding anything to the contrary contained in the Policy, this insurance is warranted free from any claim for loss, damage or expense caused by or resulting from capture, seizure, arrest, restraint or detainment, or the consequence thereof or of any attempt thereat, or any taking of the vessel, by requisition or otherwise, whether in time of peace or war, and whether lawful or otherwise; also from all consequences of hostilities or warlike

operations * * * piracy, civil war, revolution, rebellion or insurrection or civil strife arising therefrom".

Thus the critical question is whether the war vessel in leaving its Staten Island pier with orders to proceed to patrol duty off Ambrose Channel, was at the time of the collision engaged in a warlike operation.

At the trial it was practically conceded by counsel for the respondents that if a war vessel in time of war were moved from one berth to another in the New York harbor to take on cargo, fuel, munitions or what-not, she would not be engaged in a warlike operation; and the libellants vigorously contend that the intention of the parties to the policy of insurance contemplated as an exception not peaceful maneuvers in a harbor free from warlike conditions, but a present wartime activity such as, for example, attacking an enemy, preparing to engage in conflict or in an operation at sea in aid or protection of our own navy or in direct or indirect engagement in hostilities.

As not infrequently happens in the solution of these matters, not much is gained from judicial precedent, for a review of the cases fails to reveal facts identical with or substantially similar to those involved in this case.

In Reinold v. United States of America, 2 Cir., 167 F.2d 556, Judge Augustus N. Hand, in the interpretation of an exceptive "warlike operations" clause, followed Queen Ins. Co. v. Globe & Rutgers Fire Ins. Co., 263 U.S. 487, 44 S.Ct. 175, 177, 68 L.Ed. 402, which contained a similar exception. In that case the loss occurred while the vessel, the Napoli, was in a convoy which was sailing with screened lights, protected by British, Italian and American war vessels. Though in the command of an Italian officer, the Napoli was subject to the orders of a British captain as the senior naval officer in charge of the convoy. A collision resulted with a British steamship in another convoy commanded by a British officer. The Supreme Court held, in an opinion by Justice Holmes, that the loss was not attributable to warlike operations within the meaning of the policy. Judge Hand points out that the Holmes decision followed British Steamship Co. v. King [1921] 1 A.C. 99. In that case there was no negligence on the part of either vessel, and though each was sailing without lights because of Admiralty Regulations, in the absence of negligence each was considered engaged in a peaceful mission. The House of Lords held that the vessels were not engaged in a warlike operation, and that the loss was due not to a war but to a marine risk. However, the emphasis and importance of the Queen Ins. Co. v. Globe & Rutgers Fire Ins. Co. is, as Justice Holmes remarked:

"We repeat that we are dealing not with general principles but only with the construction of an ancient form of words which always have been taken in a narrow sense, and in Morgan v. United States [1] were construed to refer only to the nearest cause of loss even when there were strong grounds for looking beyond it to military command."

The English cases which are always carefully to be considered under the admonition given by Justice Holmes in Queen Ins. Co. v. Globe & Rutgers Ins. Co., supra, have been carefully briefed by counsel. However, as I have said, in the many cases referred to, the facts do not match those that we are considering in this case. Perhaps bearing most closely are cases such as the following:

The Brynawel, 17 Ll.L.Rep. 89, shows that a collier, while coaling a mine sweeper to enable the latter to continue on her warlike operations, sustained damage by bumping in the heavy seas. This was held not to be the result of a warlike operation. It was said: "she * * * was engaged in an act merely preparatory to resuming warlike operations."

In the Larrinaga, 78 Ll.L.Rep. 167, it appeared that the vessel was under charter to the Ministry of Shipping. She had been employed in transporting munitions from England to France for the British Expeditionary Forces. She received notice that after discharging at St. Nazaire on her

---

[1] 14 Wall. 531, 20 L.Ed. 738.

next voyage, she was to return to Cardiff for a joint survey and release from government service. On the return voyage she stranded. It was held that she was not on that voyage engaged in a warlike operation.

In only apparent conflict is Yorkshire Dale S. S. Co., Ltd., v. Minister of War Transport [1942] A.C. 691. The Coxwold, a vessel requisitioned by the Minister of War Transport, while sailing in convoy in the conveyance of war stores, was stranded. It was held that the proximate cause of the stranding, arising out of a deviation of course under naval orders to avoid an apprehended submarine attack, coupled with an unexpected set of the tide, was a warlike operation. The vessel was carrying munitions from one base to another, and it was admitted that she was thus engaged in a warlike operation. But Viscount Simon, in the House of Lords, said:

"This, however, is an entirely different thing from saying that any and every accident which happens to such a ship during her voyage is the consequence of a warlike operation. To suggest the contrary would be just as illogical as to say that if a postman, while engaged in the operation of delivering letters, meets with an accident in the street, this is necessarily the proximate consequence of his delivering letters * * * you do not prove that an accident is 'the consequence of' a warlike operation merely by showing that it happened 'during' a warlike operation."

Thus the inquiry should be whether the collision was in consequence of a warlike operation, not did it happen in the course of a warlike operation. He quotes Lord Sumner in Attorney-General v. Adelaide Steamship Co. Ltd. (The Warilda), 1923 A. C. 292, in stating that the true test is whether the collision was caused "effectively and proximately" by the warlike operation.

An early case was Wynnstay Steamship Co., Ltd., 23 Ll.L.Rep. 278. Two British vessels, the W. J. Radcliffe and the Sylvan Arrow, were lying at anchor in New York harbor off Staten Island, and as a result of the Sylvan Arrow dragging her anchor, the vessels came into collision. It was held that the Sylvan Arrow was not engaged in a warlike operation and significance attached to the holding that when a vessel becomes a unit of a belligerent navy, it cannot be said that her whole life from that time on involves continuous warlike operation.

In the case at bar it would not seem to be compelling to conclude that the parties to the policy of insurance intended that preliminary maneuvering in a peaceful harbor prior to reaching an appointed war station was to be deemed a warlike operation. I am constrained to reach the conclusion that it is a far fetched contention to assert that the collision in question was exempted from the marine insurance. In other words, the "cause nearest to the loss" (Queen Ins. Co. v. Globe & Rutgers Fire Ins. Co., supra) i. e. the proximate, not the remote cause, must be held to be negligence in navigation in a peaceful harbor. That the vessel in collision with the civilian ship chanced to be a warship constitutes at most a remote but not a proximate cause.

In consequence the libel should be sustained and a decree to that effect may be entered.

Concurrently with the filing of this opinion, appropriate findings of fact and conclusions of law will be filed.