**AIRLIFT INTERNATIONAL, INC., a Florida Corporation, and Slick Corporation, Plaintiffs,**

v.

**UNITED STATES of America et al., Defendants.**

**No. 69–370–Civ.**

United States District Court, S. D. Florida.

Dec. 21, 1971.

444

Walsh, Dolan & Krupnick, Ft. Lauderdale, Fla., for plaintiffs.

Robert W. Rust, U. S. Atty., Miami, Fla., Neil R. Eisner, Dept. of Transportation, Federal Aviation Administration, Washington, D. C., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND FINAL JUDGMENT

KING, District Judge.

This action, tried by the Court, sitting without a jury, was brought upon a contract of insurance between the plaintiff, Airlift International, Inc., and the defendant, United States of America. Jurisdiction is based upon 49 U.S.C. § 1540.

The Court, having considered the pleadings filed herein, the pretrial stipulations of the parties, the pretrial depositions and the oral testimony of the witnesses for the parties which was pre-sented at trial, the exhibits introduced by the parties, the memoranda of the parties, and being otherwise fully advised in the premises, hereby enters the following Findings of Fact and Conclusions of Law:

Plaintiffs were the owners of a Constellation model L–1049H aircraft, registration number N–6936C. On June 22, 1967, the L–1049H was on an IFR flight plan from Clark Air Base, Philippine Islands, to Tan Son Nhut Air Base, Republic of Vietnam. It was operating under a United States Military Airlift Command contract and had on board general cargo, four crew members and three passengers.

On the same date, a United States Air Force aircraft, an RF–4C, SN 65–861, with Captain Arthur T. Dardeau as aircraft commander and First Lieutenant Albert L. Lundell as navigator had been on a reconnaissance mission in South Vietnam.

At approximately 9:15 PM local time on June 22, 1967, plaintiffs' L–1049H was on approach to land at runway 25L at Tan Son Nhut Air Base and the USAF RF–4C was returning from its reconnaissance mission and was on initial approach to Tan Son Nhut. At that time, at an altitude of approximately 2,000 feet, about 3.5 statute miles from the approach end of runway 25L at Tan Son Nhut Air Base, the L–1049H was struck in the rear, in its middle vertical stabilizer, by the underside of the forward fuselage of the RF–4C. The pilot and navigator of the RF–4C ejected successfully and were picked up by rescue aircraft but all those on board the plaintiffs' L–1049H were killed and the aircraft was destroyed.

This Court finds that, at the time of the collision, the wing tip lights and the red anti-collision lights of plaintiffs' L–1049H and the red anti-collision light on the RF–4C were off. It is also the finding of this Court that the aircraft commander of the RF–4C did not enter the traffic pattern at Tan Son Nhut Air Base properly and that the navigator of the RF–4C did not give his full attention to observing for other aircraft in the traf-

fice pattern when the RF–4C was on initial approach to the air base. In addition, there were scattered clouds at 1700 to 2000 feet altitude in the vicinity of Tan Son Nhut and they caused the pilot of the RF–4C to fly below the traffic pattern altitude. Finally, this Court also finds that the radio in the RF–4C was inoperative when it was on initial approach to the air base.

On the date of the loss, June 22, 1967, plaintiffs had two insurance policies in effect covering the L–1049H, N–6936C. One was a general aviation hull insurance policy issued by Pacific Indemnity Co. (hereinafter referred to as the "all risk" policy); the other was a Non-Premium Hull War Risk Insurance Policy issued by the defendant [1] (hereinafter sometimes referred to as the "war risk" policy). The "all risk" policy excluded from its coverage what are generally referred to as "war risks." Subject to specified limitations, those "war risks" excluded from the plaintiffs' "all risk" policy were covered by the "war risk" policy.[2]

The basic issue that is to be decided by this Court is whether the loss of the L–1049H is covered by the insurance policy issued by the defendant. The relevant language of the government's insurance policy covering the L–1049H, the only language under which it would be possible for the plaintiffs to recover against the government for this loss, provided as follows:

> This insurance covers all physical loss or damage to the (plaintiffs') aircraft . . . resulting from the risks which . . . (are) excluded from . . . (the plaintiffs') commercial Aviation Hull Policy by the following clause:
>
>> "Loss or damage due to or resulting from: . . . war . . . or warlike operations, whether there be a declaration of war or not . . ." [3]

■ The primary condition for recovery under the war risk policy is that the physical loss or damage must result from a risk excluded from the plaintiffs' commercial aviation hull policy, the "all risk" policy, by the "war risk exclusion" or "free from capture and seizure" clause that was used as the government's coverage clause; basically, this means that the damage must be proximately caused by a risk of war or warlike operations. Standard Oil Company of New Jersey v. United States, 340 U.S. 54, 58, 71 S.Ct. 135, 95 L.Ed. 68 (1950), Libby, McNeill & Libby v. United States, 340 U.S. 71, 71 S.Ct. 144, 95 L.Ed. 86 (1950). The burden of proving that the loss falls within the war risk policy coverage—that the loss resulted from a war risk rather than an aviation risk—is on the plaintiffs. United States v. Standard Oil Co. of New Jersey, 178 F.2d 488, 495 (2d Cir. 1949), aff'd, 340 U.S. 54, 71 S.Ct. 135, 95 L.Ed. 68 (1950).

A better understanding of the burden plaintiffs must meet can be obtained by a closer analysis of the *Standard Oil* case,

---

1. This insurance was issued by the United States pursuant to Title XIII—War Risk Insurance of the Federal Aviation Act of 1958, as amended. 49 U.S.C. § 1531 et seq. Although the aviation war risk insurance program was administered, initially, by the United States Department of Commerce, with the creation of the Department of Transportation, it was transferred there, 49 U.S.C. § 1655(a) (3) (c) and then delegated to the Federal Aviation Administration. 49 CFR 1.4(b) (1) (1968).

2. The risks included in the coverage clause used in the government's war risk insurance policy were the same "war risks"

excluded from the plaintiffs' "all risk" policy. The result is that, in the present case, if all other conditions have been met, coverage for the loss must be under one of the policies.

3. The insurance was provided subject to all limitations of applicable provisions of law, particularly Title XIII of the Federal Aviation Act of 1958, as amended, 49 U.S.C. § 1531 et seq. In addition, the government's policy is "(w)arranted free from any claim for loss, damage or expense covered under any commercial policy in effect for the benefit of the Insured."

which involved the analogous area of marine war risk insurance. In that case, the United States had issued a war risk insurance policy covering a vessel which collided with a United States Navy minesweeper. The policy included, as its coverage clause, a war risk exclusion clause similar to the one involved in the subject litigation; its particular, relevant wording was: "loss, damage, or expense caused by or resulting from . . . all consequences of hostilities or warlike operations." 178 F.2d at 489–490. When the case reached the Supreme Court, it was held that:

> (1) Losses from collisions are prima facie perils of the sea covered by standard marine risk policies. To take such a loss out of the marine policy and to bring it within the coverage of the provision insuring against "all consequences of" warlike operations, common sense dictates that there must be some causal relationship between the warlike operation and the collision . . . . In turn, the existence or nonexistence of causal connection between the peril insured against and the loss has been determined by looking to the factual situation in each case and applying the concept of "proximate cause" . . . . (Proximate cause) "refers to that cause which is most nearly and essentially connected with the loss as its efficient cause." 340 U.S. at 57–58, 71 S.Ct. at 137 (Footnotes omitted).

The Court of Appeals in the Standard Oil case was even clearer when it held that "not only must the vessel's mission be one of war, but the warlike character of its operation must be the dominant and effective cause of the resulting catastrophe." 178 F.2d at 490.

■ A review of the evidence in this case clearly indicates that plaintiffs have not met their burden of proof. This Court finds that neither aircraft was on a warlike operation and that, even if they were, the accident was not caused by a warlike operation. The mid-air collision and subsequent loss resulted from a peril of the air, not a peril or risk of war. As a result, recovery cannot be had under the government's war risk insurance policy.

At the time of the mid-air collision, the USAF RF–4C was returning from its reconnaissance mission and plaintiffs' L–1049H was on a United States Military Airlift Command contract flight from Clark Air Base, Philippine Islands, to Tan Son Nhut Air Base, Republic of Vietnam, carrying general cargo and three passengers. The facts do not support a conclusion that either aircraft was on a warlike operation.

The mere flight of an Air Force jet is not a warlike operation. In Meseck Towing Lines, Inc. v. Excess Ins. Co., Ltd., 77 F.Supp. 790 (E.D.N.Y.1948) the Court held that a United States Naval vessel leaving its pier with orders to proceed to patrol duty was not engaged in warlike operations. Id. at 792–793. The Court pointed out that such maneuvering was "prior to reaching an appointed war station." Id. at 793. In the present case, the RF–4C was returning from its "appointed war station," the place where it had done its reconnaissance; it was not at that station. At the time of the collision, there were no combat conditions prevalent; the evidence established that the nature of the RF–4C's operation was not warlike.

■ Plaintiffs have argued, however, that the United States Department of Defense has for claims and pay purposes, determined that the RF–4C was on a combat mission at the time of the loss. It is apparently their position that "combat mission" would be within the meaning of "warlike operation." Assuming this to be so, it must be stressed that there were specific administrative purposes for which that Department of Defense definition was established; it cannot bind the government in other areas. The insurance language in question was drafted by different individuals with a different intent and purpose; it does not relate to the administrative purposes of the Department of Defense defini-

tion. Moreover, the language in question is based on non-governmental, commercial insurance language. Before coverage could be placed under the government's policy, plaintiffs would first have to establish that the loss was excluded from the commercial "all risk" policy covering the L–1049H. Since interpretation of that commercial clause would not be subject to a governmental definition, the government's clause would not be either. In this respect, it is immaterial that the war risk insurer is the government. *See* Annot., 95 L.Ed. 80 (1951).

As to the L–1049H, it was operating under a United States Military Airlift Command contract at the time of the accident. The United States has admitted that the transportation of military supplies and personnel between war bases is a warlike operation. Libby, McNeill and Libby, *supra*, 340 U.S. at 71–72, 71 S.Ct. 144. However, the operation must be between "war bases," a term subject to dispute over definition. The L–1049H was not flying between "war bases"; even if Saigon could be considered a "war base"—aircraft on commercial operations did land there at the time— there was no evidence establishing that the place of departure, the Philippine Islands, was. In addition, the courts have held that it is the nature of the operation of a vessel, not the character of the cargo, which would determine whether it is engaged in a warlike operation. Queen Ins. Co. v. Globe & R. F. Ins. Co., 282 F. 976, 981 (2d Cir. 1922), aff'd, 263 U.S. 487, 44 S.Ct. 175, 68 L.Ed. 402 (1924). The nature of the operation was not warlike; this same aircraft could have been in the same place, at the same time and under the same conditions, carrying commercial cargo or passengers. If the nature of the Air Force jet's operation was not warlike, neither was that of the L–1049H's. *See* Esso Standard Oil Co. v. United States, 122 F.Supp. 109, 111–112 (S.D.N.Y.1954), aff'd, 221 F.2d 805 (2d Cir. 1955). Furthermore, if the cargo carried is relevant, plaintiffs have failed to establish that military supplies were being transported; simply showing that general cargo was being carried under a Military Airlift Command contract is insufficient.

Since neither aircraft was on a warlike operation at the time of the subject loss, plaintiffs cannot recover under defendant's insurance policy.

Even if this Court were to find, however, that one, or both, of the aircraft was on a warlike operation, the plaintiffs would still be required to establish that such operation was the proximate cause of the loss. Again, the plaintiffs have failed to meet this burden; they have failed to establish the necessary causal relationship.

"(T)he inquiry should be whether the collision was a consequence of a warlike operation, not did it happen in the course of a warlike operation." Meseck Towing Lines, *supra*, 77 F.Supp. at 793. *See also*, Daranowich v. Land, 186 F.2d 386, 388 (2d Cir. 1951), cert. denied, 341 U.S. 942, 71 S.Ct. 997, 95 L.Ed. 1368 (1951) ("Liability is not assumed (by the war risk insurer) for every death however caused, even though it would not have happened if the seaman had not been a member of the crew.") The fact "(t)hat the vessel in collision with the civilian ship chanced to be a warship constitutes at most a remote but not a proximate cause." Meseck Towing Lines, *supra*, 77 F.Supp. at 793.

Every loss, then, that occurs during a warlike operation is not recoverable under the war risk insurance policy.

If any loss occurring to a vessel engaged in a warlike operation is a consequence of hostilities, there would be no point in the taking out of marine insurance by ships devoted to missions of war, since the war risk insurance provided by the Government would cover any losses they might incur. Annot., 95 L.Ed. 80, 81 at f. n. 9 (1951); *see, also*, United States v. Standard Oil Co. of New Jersey, *supra*, 178 F.2d 493.

"But the contrary is of course the practical course followed." *Standard Oil, supra*, at 493.

■■ Moreover, it is not sufficient to show that the existence of war increased the risk of an accident. An increase in a danger or probability is not a direct or proximate cause of an accident; at most, it is an indirect cause. When the presence of war causes an increase in the risk of an accident—as where navigation aids are removed to hinder enemy discovery of a ship—it is not, per se, a ground for recovery under war risk insurance. *See*, Muller v. Globe & Rutgers Fire Insurance Co., 246 F. 759, 762 (2d Cir. 1917); Standard Oil, *supra*, at 178 F.2d 493; *see also* Queen Ins. Co. v. Globe & R. F. Ins. Co., *supra*, 282 F. at 979–980.

In the past, the commercial "all risk" insurers have even recognized their liability for losses that result from collisions between vessels caused by such things as the absence of lights due to the danger of attack and have assessed extra charges because of "increased navigation perils due to the war." 51 Yale L.J. 674, 675 (1942). The Court of Appeals in Standard Oil determined that "it was not the intention of the parties that the war risk insurance should provide complete coverage for the vessel" while engaged in a warlike operation, 178 F.2d at 493, and, looking to the Yale Law Journal article cited, *supra*, concluded that marine insurance did not become superfluous during the war. *Id.*

The very fact that an aircraft is required to fly on a mission of war increases the possibility—as compared to the situation where it remains on the ground—that it will be involved in an accident. Prosser has put it aptly: "In a philosophical sense, the consequences of an act go forward to eternity, and the causes of an event go back to the discovery of America and beyond. 'The fatal trespass done by Eve was cause of all our woe.'" Prosser, Torts 282, 3rd Ed. 1964. Simply establishing a causation chain is insufficient. *Id.* at 243. Plaintiff must show proximate cause, dominant and effective cause. Standard Oil, *supra*, at 340 U.S. 57–58, 71 S.Ct. 135 and 178 F.2d 490.

Nor can the present case be distinguished simply because it occurred in an alleged "war zone." There are numerous cases where losses in active "war zones," during warlike operations, were held not to be proximately caused by war risks. One example was the loss during a mine sweeping operation in *Standard Oil, supra*. Another example is White v. United States, 154 U.S. 661, 14 S.Ct. 1192, 26 L.Ed. 178 (1880); in that case, a vessel became stranded because of negligence while maneuvering to land troops in a theatre of active operation; the damage was held to be due to marine risks, not war risks. *See* decision below, 11 Ct.Cl. 578 (1875).

Finally, if the "all risk" insurers intended to exclude from coverage any loss that was due to an increase in a risk due to a war or that occurred in a war zone, they could have used much clearer language. It would seem, for example, that they could have used a geographical exclusion, excluding from coverage all flights into Vietnam or Southeast Asia.

Therefore, even if the aircraft were engaged in warlike operations, this Court finds that the proximate cause of the loss was an operation or risk other than a warlike operation or war risk.

■ It is the conclusion of the Court that the failure of the crew of plaintiffs' L–1049H to have its wing tip lights and the red anti-collision lights on at the time of the collision between the L–1049H and the RF–4C was the proximate cause of the collision and the destruction of plaintiffs' aircraft. This failure to follow the rules of good airmanship is not a war risk or warlike operation; it is negligence. As the Supreme Court has clearly held in such cases as *Standard Oil, supra, Libby, McNeill & Libby, supra,* and *White, supra,* negligence is not a war risk or warlike operation; if it is the proximate cause of a loss, recovery cannot be had under a war risk insurance policy.

That this negligence was the proximate cause of the accident is clear. The purpose of the lights is to enable the air-

craft to be seen. If they had been on, the RF–4C aircraft commander would have seen the L–1049H in time to have avoided the accident. If they had been on and the RF–4C aircraft commander had not seen them, then he would have been negligent for his failure to follow a primary rule of the visual flight rules under which he was operating: to see and avoid other aircraft. With the lights off on the L–1049H, however, he could not see it in time to avoid it. In addition, without the lights, the possibility that the L–1049H would be seen by the air traffic control tower at Tan Son Nhut was greatly decreased. This, in turn, limited the tower's ability to observe the presence of a conflict, to observe that two aircraft were on a collision course. If they had observed this, they could have radioed the aircraft to take evasive action.

■ It has been argued by the plaintiffs that the L–1049H had its lights off so that it could avoid ground fire. There is, however, no evidence on this point. Plaintiffs have not established that there was any ground fire that night in that area; indeed, the evidence indicates there was none. Plaintiffs have also argued that the lights would have been turned off in anticipation of ground fire, that the crew of the L–1049H would turn their lights off on the approach because there might be people on the ground who might fire at them. Again, plaintiffs have failed to meet their burden of proof. This is all mere speculation; there is no support in any of the evidence that was submitted. Plaintiffs have not shown that this procedure would normally be followed. They have not shown why other apparent means for determining whether there was a danger of ground fire could not have been used; it seems that the pilot of the L–1049H could have radioed the air traffic control tower at Tan Son Nhut, for example, to ask them if they knew or could determine if there was any activity in the area of their approach which could pose a danger to them. Moreover, the deposition of the aircraft commander of the RF–4C indicated that he had all his lights on even though he was flying over the same area as the L–1049H. Although his red anti-collision light was out, the aircraft commander's testimony indicates he did not know this, that he thought he had turned on that light when he turned on the others. In addition, based on the testimony of the expert witness presented by the Government, it would be an act of negligence to turn off all the aircraft lights to avoid ground fire; the wing tip lights should have been kept on.

The fact that the aircraft collided where they did further compounds the negligence in the lack of lights. Plaintiffs' aircraft was at an altitude of approximately 2000 feet when only about 3.5 statute miles from the approach end of the runway. The L–1049H should not have been this high at that point and, as a result, the RF–4C aircraft commander would not have expected it to be there. If the aircraft commander of the RF–4C knew the L–1049H was in front of him, perhaps through monitoring his radio frequency, he would not have been looking for the L–1049H at the point where they collided, and the lack of lights would have made it even harder to "see and avoid."

There were other factors which played a role in this accident. It is the conclusion of the Court that none of them were war risks or warlike operations.

■ The radio failure in the RF–4C also contributed to this accident. A properly functioning radio could possibly have prevented this accident by permitting the transmission of information which would have made it possible for the aircraft pilots to be alerted to each other's positions. The war risk insurers are not liable for losses due to equipment failure. The Court of Appeals in the *Standard Oil* case cited, with apparent approval, an English case, Clan Line Steamers Ltd. v. Board of Trade (The Clan Matheson), (1929) A.C. 514, with an analogous problem in which it was held that a breakdown in steering gear, the proximate cause of a collision between two ships, was a marine risk, not

a war risk. 178 F.2d at 491. In another case, Goodwin v. United States, 84 U.S. 515, 17 Wall. 515, 21 L.Ed. 669 (1873), it was held that the damage resulting from a leak while a vessel chartered to the United States was carrying military stores, was not due to a war risk. Therefore, if the USAF RF–4C radio was in an inoperative condition when the RF–4C was on initial approach to Tan Son Nhut Air Base, this would be a general aviation risk, not a war risk, and recovery for the role played by such a risk would be under the "all risk" policy. Plaintiffs argued that the equipment failure was due to the war, that equipment could not be properly maintained under the conditions existing at Tan Son Nhut. Again, however, there is no evidence to support this point; in fact, the Government's expert witness stated that the equipment would have been in better condition because it received the use necessary for such equipment to be kept in peak operating condition. Moreover, even plaintiffs refer to this as an increase in a hazard; as already discussed herein, an increase in a risk is not a proximate cause.

■ The failure of the red anti-collision light on the RF–4C to be on at the time of the collision was another factor in the collision. It lessened the possibility of the RF–4C being seen by the L–1049H and the tower, decreasing the ability of both to take action to prevent a collision. The evidence indicates that the failure of the light to be on was due either to negligence or equipment failure; as explained above, losses resulting from these risks are not recoverable under the war risk policy.

In addition to the above, plaintiffs argued at trial that there were other factors which played a role in this accident. It is the conclusion of this Court that these factors did not play a role.

■ One of the factors that plaintiffs raised was the traffic conditions that existed at Tan Son Nhut. Plaintiffs argued that because of the war there was a high concentration of aircraft operating in and out of the air base. Yet, plaintiffs' evidence did not establish that such a high concentration existed at the time of the accident. The evidence presented indicates the contrary. Nor did plaintiffs even establish that such a high concentration would cause mid-air collisions. Pilots still have a duty to see and avoid other aircraft, regardless of the traffic conditions. Finally, even if such conditions existed and they would play a role in mid-air collisions, they could only be an indirect cause, an increase in a risk. They could not place the loss within the war risk policy.

Another factor that plaintiffs stressed was the mix of various types of aircraft at Tan Son Nhut; it was argued that they would not be mixed but for the war. Plaintiffs argued, further, that the presence of helicopters especially increased the risk caused by the mix. If anything, the evidence indicates that there were no helicopters in the area at the time of the collision. Furthermore, plaintiffs' evidence did not establish that mixing aircraft like the RF–4C and the L–1049H and helicopters is done only during or because of a war or that such a mix would cause mid-air collisions. Again, pilots still have a duty to see and avoid and should be able to perform that duty. Finally, even if plaintiffs proved this point, they would only have established an increase in a risk and not a proximate cause. This, as already shown, is insufficient.

■ The amount of fuel left on the RF–4C was also argued by plaintiffs to have played a role. Again, plaintiffs failed to prove this; the evidence indicates that the fuel remaining was sufficient, that it was not a controlling factor in the operation of the RF–4C at the time of and immediately preceding the collision. In addition, if it did play a role, it, too, would simply be an increase in a risk, an indirect, not a proximate cause.

It is important at this point to note the the similarity between this case and two Supreme Court cases. In the *Standard Oil* case, *supra*, the Supreme Court found

that a loss due to a collision in which one of the ships, a United States Navy minesweeper, was in the process of sweeping for mines— a conceded warlike operation—was not covered by the war risk insurance policy, since it resulted from a failure to follow good operating practices. In the other case, *Libby, McNeill & Libby, supra,* a civilian vessel had been chartered to, and was operated by, the United States on a warlike operation; the Supreme Court found that the stranding of the ship because of a steering mistake by a helmsman was not covered by a Government war risk insurance policy.

 The loss of this aircraft, then, was not due to and did not result from war or warlike operations. It was destroyed as the result of a simple mid-air collision with another aircraft, a collision resulting from a "failure to comply with the applicable rules and the requirements of good . . . (air)manship." Standard Oil, *supra,* 178 F.2d at 495. This is a normal aviation risk, not a risk of war. *Id.* The same type of collision could have occurred with a nonmilitary aircraft; it could have occurred over a completely peaceful area such as the continental United States; it could have occurred with or without the war, with or without the military aircraft, with or without the Military Airlift Command operation. The fact that the L–1049H was on a Military Airlift Command operation when it collided with a military jet in what might be termed a war zone does not, in itself, make this accident the result of a war or warlike operation. This accident could have occurred without the warlike operation. *See* Prosser, *supra,* at 242–3.

It is extremely interesting to note, as a final point, that one authority has made a "(d)iligent search . . . (and found) no case whose authority is not impeached by later decisions, in which, apart from actual seizure by a beligerent, a federal court has conceded that a loss is within the protection of a war risk policy." Annot., 95 L.Ed. 80, 84 (1951) (footnotes omitted).

Based on the above analysis, it is this Court's finding that the loss suffered by plaintiffs as a result of the mid-air collision between its L–1049H and the USAF RF–4C did not result from a war or warlike operation and recovery cannot be had under the contract of insurance between plaintiffs and the defendant, United States of America. Therefore, it is

Ordered and adjudged that judgment be and it is hereby entered in favor of defendant and against plaintiffs.